### ORDER

Thomas Scherer, Indianapolis, Ind., John M. Cloud, Dayton, Ohio, for debtors.

Arthur Schuh, Cincinnati, Ohio, for Nationwide Life Ins.

Thomas R. Noland, Dayton, Ohio, for Official Creditors' Committee.

Ira Rubin, Dayton, Ohio, Steven D. Huff, Milwaukee, Wis., for Multi-Empl. Pension Fund.

Jack Pigman, Columbus, Ohio, for Bank One.

Phillip E. Langer, Dayton, Ohio, for Scot Lad.

Raymond P. Cunningham, Raymond J. Pikna, Jr., Columbus, Ohio, for Malone & Hyde.

Wm. Patrick McGuinn, Asst. City Atty., Edward H. Siddens, Dayton, Ohio, for Gem Sav.

**In the Matter of The CONCORD STORAGE AND WAREHOUSE COMPANY, INC., Debtor.**

**In re SCHEAR REALTY AND INVESTMENT COMPANY, INC., Debtor.**

**Bankruptcy Nos. 3–82–01638, 3–82–01843.**

United States Bankruptcy Court, S.D. Ohio, W.D.

June 18, 1984.

Jack Pickrel, Dayton, Ohio, for Aetna Life.

W. James Ollinger, Cleveland, Ohio, for Second Pension Plan.

## DECISION

CHARLES A. ANDERSON, Bankruptcy Judge.

The debtors in these related but unconsolidated cases moved on 6 January, 1984 to dismiss the Chapter 11 case per 11 U.S.C. § 305. This matter was considered at numerous pretrial conferences with all interested parties and at a trial on June 5, 1984.

Based upon the evidence adduced, including the case record judicially noticed, the court makes the following findings.

Both debtors, the Schear Realty and Investment Company, Inc. and the Concord Storage and Warehouse Company are involved in commercial real estate investment and management, owning about 18 separate parcels of land. These two debtors are related in that both are subsidiaries of the Schear Group, Inc. Schear Group is an Ohio corporation organized by four Schear brothers. The Schear Group and/or the brothers own or have an interest in at least 12 other enterprises, including the Liberal Market, Inc., a grocery retail chain operating stores in southwestern Ohio. Debtors' financial difficulties arise, for the most part, because of their close relationship with Liberal Market and the Schear Group. The Schear brothers and the Schear Group, Inc. as parent corporation and owner of the debtor corporations herein, have not been made debtors subject to bankruptcy court jurisdiction.

Liberal Market began experiencing financial difficulties in the middle and late 1970's. Because of the losses incurred by Liberal Market, Schear Group, Inc. incurred increasing amounts of indebtedness. The proceeds of loans incurred by Schear Group, Inc. were, for the most part, made available for Liberal Market operations. To secure these debts mortgages were granted by Concord Storage, Schear Realty and other corporations affiliated with Liberal Market. By 1980, substantial debts were owing to the Winters National Bank & Trust Company of Dayton (now "Bank One"), Scot Lad Foods, Inc. ("Scot Lad"), and Malone & Hyde or M & H Financial Corp. ("Malone & Hyde"). These accumulated debts were secured by, among other things, blanket mortgages on virtually all of the real property owned by Concord Storage and Schear Realty, as well as by other affiliates of Liberal Market, including Third Western. In addition, the blanket mortgagees hold personal guarantees of the Schear brothers: Herbert Schear, Harry Schear and Eugene Schear and a contingent claim against the estate of Hyman Schear, deceased. Bank One also holds an indemnifying mortgage against certain land of Schearbrook Land and Livestock, Inc., a Schear Group subsidiary.

As the operating losses of Liberal Market increased, there was another adverse effect on Schear Realty and Concord Storage. Liberal Market was a tenant in several properties owned by Schear Realty and Concord Storage. As Liberal Market's sales continued to drop and stores were closed during the course of a reorganization case, cash flow available to Schear Realty and Concord Storage diminished. An example of the effect of the reduction in cash flow caused by Liberal Market's financial difficulties is the meat processing plant owned by Concord Storage located on Grange Hall Road in Beavercreek, Ohio. When Liberal Market had no economic justification for maintaining its lease at the meat processing plant, there was no income to meet continued debt service.

Liberal Market filed a voluntary Chapter 11 petition on February 4, 1981, following the long and protracted economic difficulties herein mentioned and vitriolic negotiations with labor unions over collective bargaining agreements.

With the filing in Chapter 11 of Liberal Market, additional financial difficulties for Concord Storage and Schear Realty were created. First, it became difficult for Concord Storage and Schear Realty to deal

freely with those properties which had become vacant due to the leasehold interests of Liberal Market. These leasehold interests were deemed assets of the Liberal Market bankruptcy estate and were tied up for months during the administration of the case. Moreover, the Creditors' Committee of Liberal Market, Inc., on behalf of Liberal Market, brought certain law suits naming Schear Realty and Concord Storage and other Schear Group, Inc. entities which caused significant legal costs to be incurred.

Because of its financial difficulties, Liberal Market withdrew from several employee pension and benefit plans. On August 21, 1981, and January 28, 1982, these various pension plans instituted lawsuits in the District Court for the Southern District of Ohio, asserting withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980. These claims are disputed and are still pending in that Court.[1]

Foreclosure suits were filed in three Ohio counties and one in Kentucky against the Debtors by secured creditors in 1981 and 1982 including Nationwide Life Insurance Company and Union Central Life Insurance Company. Aetna Life Insurance Company commenced a foreclosure proceeding against the meat processing plant.

Debtors, in their Disclosure Statements, readily admit:

"The [Chapter 11] filings of the Concord Storage and Schear Realty proceedings were triggered by imminent foreclosure sales of properties which the Debtors believed had value which would be lost in the event of a foreclosure sale."

On June 4, 1982, Concord Storage filed a voluntary petition under Chapter 11 in this Court. On its Summary of Debts and Property, it listed $9,373,282 in property ($9,325,000 in realty) and $14,104,204 in debts. The latter amount for debts was broken down as $8,851,930 in secured claims and $5,200,179 in unsecured claims of which $4,530,000 was attributable to the pension funds' claims, $205,595 is listed for Schear Realty, $60,591 for Schear Group and $374,126 for Liberal Market. Thus, general unsecured creditors account for $29,867.

Three weeks later, on June 25, Schear Realty likewise filed its Chapter 11 petition. It listed $4,691,568 in property ($3,710,400 in realty) and $15,669,883 in total debts: $11,072,868 secured with the $4,565,557 unsecured amount broken down as follows: $4,530,000 for the pension funds' claims, $11,151.69 is a disputed claim by Liberal Market, leaving $24,405 for general unsecured creditors.

On January 6, 1984, debtors filed the instant motion to dismiss the Chapter 11 proceedings and to obtain approval of the sale for $5,322,000 of substantially all of debtors' assets along with the assets of other affiliated companies (other Schear Group affiliates not subject to this Court's jurisdiction). Proceeds of the proposed sale are alleged to be sufficient to pay all administrative claims, tax claims and undisputed unsecured claims. The undisputed unsecured claims, however, are only nominal totalling about $54,000.00. Secured claims are to be paid either in full or in the amount agreed to by the parties. The claims of the pension funds are not to be paid immediately from these sale proceeds because the funds realized after payment of secured claims would satisfy only a small percentage of the entire amounts claimed in the case pending in the United States District Court.

Numerous objections to the dismissal and proposed sale were filed.

Gem Savings Association and Nationwide Insurance Co. object to the sale of the property arising out of their positions as mortgagees.

---

1. *See, UFCW Unions and Food Employers' Pension Plan of Central Ohio v. Schear Group, et al.,* Case # C–3–81–439 and *UFCW Int'l Union—Industry Pension Fund v. Schear Group, et al,* Case # C–3–82–020. Because the parties therein are awaiting a decision on defendants' motion to dismiss that action, there has been no activity in either case since June 28, 1982, according to the docket sheets.

The City of Dayton, Ohio, objects to the sale to the extent that it affects any interest it may have in certain property which it claims to own. Dayton's claim is presently being litigated in state court.

The Creditors' Committee objects not to the sale itself, but rather to the distribution of the proceeds. It and the pension funds have filed objections to the secured claims of the blanket mortgagees, contending that debtors did not receive fair consideration for the grant of the mortgages.

There are numerous other contested matters and adversary proceedings pending before the Court. Bank One Dayton, N.A. ("Bank One") and Scot Lad Foods ("Scot Lad") have joined as plaintiffs seeking relief from the automatic stay to permit them to foreclose their mortgages. The Creditors Committee has requested conversion to Chapter 7 or, alternatively, for the appointment of a Chapter 11 Trustee. The debtor has moved to have the Pension Funds removed as members of the Creditors Committee. As mentioned *supra*, the Creditors Committee and the Pension Funds have filed objections to the secured claims of Bank One, Scot Lad, and Malone & Hyde and M & H Financial Corp. ("Malone & Hyde") claiming that such blanket mortgages are avoidable under 11 U.S.C. § 544(a) as fraudulent transfers under state law (ORC § 1336.01).

The debtors have filed objections to the Pension Funds' claims and have requested a summary determination of those claims under 11 U.S.C. § 502(c).

Finally, there is pending the debtors' Second Amended Consolidated Plan of Reorganization which was set for a confirmation hearing on June 18, 1984. If the debtors' motion to dismiss is granted, all these matters will be rendered moot. Hence, the instant aspect of the case was set for hearing and disposition ahead of the others.

## DECISION

The goal of the bankruptcy laws as embodied in both the former Bankruptcy Act and the 1978 Code is to give debtors a fresh start while protecting the legal rights of interested parties. In a Chapter 11 Reorganization, this "fresh start" translates into the rehabilitation of the debtor so that it becomes a viable member of the business community. Complete liquidation of all assets under a Plan of "Reorganization" is at best only a secondary expediency to maximize values. It is axiomatic, however, that for these laws to function multiple conflicts must be resolved.

Under the Bankruptcy Act of 1898, the bankruptcy court could dismiss bankruptcy cases which were filed in bad faith or for an improper purpose. Courts must continue this practice of dismissing such cases under the Code. *See, e.g. In re Fast Food Properties Ltd. # 1*, 5 B.R. 539, 2 C.B.C.2d 1159, 6 B.C.D. 909 (Bkrtcy., CD Cal 1980).

In this case, it is undisputed (in fact debtors readily admit), that their sole purpose in filing these Chapter 11 petitions was to stop the foreclosure actions previously instituted in the various state courts. Since this reason, standing alone, should not be a recognized purpose to file a Chapter 11 reorganization petition, these petitions herein could be dismissed on this basis alone without further discussion. However, there are present other compelling factors also mandating dismissal.

Unfortunately, despite those reasoned opinions which deplore the inefficiency and expense of the judicial system, the function of the bankruptcy court to preside over effective reorganizations of Chapter 11 debtors is viewed under present political trends as merely ancillary to the jurisdiction of state and U.S. district courts over basic conflicts appearing in such reorganizations.

While the exact meaning of *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) may be unclear because of the four opinions and sharply divided Court, the majority of the justices agreed, in the words of Chief Justice Burger in his dissent at 102 S.Ct. 2882: "a 'traditional' state common-law action, not made subject to a federal rule of decision,

and related only peripherally to an adjudication of bankruptcy under federal law, must, absent the consent of the litigants, be heard by an 'Article III court' if it is to be heard by any court or agency of the United States."

The "Model Rule" adopted by all of the Circuits further delineates the jurisdiction of bankruptcy courts to adjudicate only certain issues: according to Rule (d)(3) "Related proceedings are those civil proceedings that, in the absence of a petition in bankruptcy, could have been brought in a district court or a state court." That "Model Rule" further explains that such related proceedings are only *referred* to the bankruptcy judges whose decisions are not final, but are rather submitted to the district judge for approval, absent the parties' consent, thus adding an expensive judicial veneer and only semantically addressing the vital interests of the litigants.

That current jurisprudence is redefining and circumscribing bankruptcy court jurisdiction is further evidenced by the congressional debates concerning pending legislation to rectify the constitutional issues raised in *Marathon*. See H.R.5174 and S.1013, 98th Congress. In particular the Court notes the *requirement* that bankruptcy judges (and district judges) must abstain as to "state law" issues, which in fact impact all bankruptcy court litigation.

To date, the parties herein have been confronted with such numerous related proceedings, such as the issues of real estate foreclosure and fraudulent transfers to be decided under Ohio law and the liability and valuation issues of the pension funds' claims to be decided under federal law by the district court. It is apparent that these related proceedings have overshadowed, if not overwhelmed, the core bankruptcy issues present.

As noted above, these cases involve only nominal general unsecured claims: about $54,000 out of debtors' total debts of $29,774,087 (or about 0.18%).[2] The remaining 99.82% of debts represent secured creditors protected under state law or disputed claims, litigation of which is pending in the U.S. district court.

Any possible Chapter 11 reorganization herein could, more appropriately, be termed a liquidating real estate workout. Considering the staggering extent of the secured claims, confirmation of any plan of reorganization would likely be anticlimactic.

Further, any proposed real estate workout with the secured creditors would be beyond the jurisdiction of this Court because the necessary parties and negotiations are not subject to its jurisdiction. The parent corporation, the Schear Group, and the principals therein, the Schear brothers, are not before this Court as either voluntary or involuntary debtors. Any cooperation on their part with a workout would be entirely voluntary, subject only to liabilities and restrictions properly imposed by state and nonbankruptcy federal law (and Courts).

The persistent relegation of the jurisdiction of the bankruptcy judges to the parameters of "Article I" jurisdiction (whatever such designation imports) as now demonstrated by the judicial and congressional reaction to the impact of the *Marathon* case clearly signals that the intent of the Congress enacted into the 1978 Bankruptcy Code to lessen and ameliorate the deleterious economic impact of fragmented litigation in bankruptcy cases (now exceeding the volume of litigation in all other federal courts) must defer to what is apparently deemed a system more amenable to the political process. The purpose of providing litigants involved in bankruptcy cases a speedy and efficient resolution of all conflicts and issues in one court by "Article III" Judges, whether involving federal, or state law, has been supplanted by multifarious litigation in both federal and state courts.

Such a system of judicial administration dictates a conceptual reexamination of the

---

2. According to debtors' dismissal motion, these claims are to be paid in full from the proceeds of the sale. Thus, their claims appear to be soon satisfied.

intent and purpose of a suspension or dismissal under 11 U.S.C. § 305 and interpretations thereof in light of circumscribed jurisdictional concepts in the determination of the best interests of creditors and debtors, particularly in Chapter 11 Reorganization and Chapter 13 Adjustment of Debts of Individuals. For such entities in dire financial and economic stress before filing in the bankruptcy court, delays often counted in years and resultant litigation costs render moot the possibility of submitting a plan confirmable by the bankruptcy court either as feasible or in the best interests of creditors. All courts can no longer appear oblivious to the exorbitant effects of litigation vis-á-vis more advanced and progressive methods of conflict resolution. Any system of judicial administration which may evolve from procedural changes now taking place by statute and rule enacted for the administration of the bankruptcy case judicial process can and must be made effective to the fullest extent possible. It will be incumbent upon the bench and bar to so implement the tools provided. By the same rationale, all alternative methods must likewise be explored in terms of the best interests of the disputants, especially including results anticipated and the economic costs.

This truism has repeatedly been espoused by Chief Justice Warren E. Burger, in echoing the gauntlet thrown down by Roscoe Pound 71 years earlier. He most recently repeated such admonitions in his *1983 Year-End Report On The Judiciary, Costs of Justice in America* at pages 15–18, as follows:

"Recent studies confirm what those of us with experience in the courts have known for years: the public costs of private litigation are enormous and often can cost taxpayers more to process than is at stake in the litigation. Public costs are yet another indication that we must find alternative ways to settle disputes."

\*        \*        \*        \*        \*        \*

"Experimentation with new methods in the judicial system is imperative given growing caseloads, delays, and increasing costs. Federal and state judges throughout the country are trying new approaches to discovery, settlement negotiations, trial and alternatives to trial that deserve commendation and support. The bar should work with judges who are attempting to make practical improvements in the judicial system. Greater efficiency and cost-effectiveness serve both clients and the public. Legal educators and scholars can provide a valuable service by studying new approaches and reporting on successful innovations that can serve as models for other jurisdictions, and on experiments that do not survive the scrutiny of careful testing."

What the Chief Justice does not mention is the growing recognition by the public that the litigation costs, even with the cosmetic procedural experimentation by the courts, cannot be feasibly sustained by litigation in multifarious courts with fragmented jurisdiction. Extrajudicial methods become the only recourse, supplanting the judicial process. In these instant cases, as a matter of fact, what progress has been made to date was extrajudicial. Litigation has been stymied by jurisdictional fragmentation.

Thus, it becomes apparent that the admitted guise of exploiting the bankruptcy court jurisdiction to stay and frustrate the basic conflicts pending in other courts accomplishes no purpose that cannot be effected in those other courts, albeit inadequately. The best interests of debtors, creditors, all interested parties (and the public) dictate dismissal of these proceedings as expedient pursuant to 11 U.S.C. § 305, if all interested parties before the court can be properly protected.

In behalf of the Pension Funds, counsel has quite appropriately and wisely urged that, "While the Debtors have filed a Plan of Reorganization and Disclosure Statement under which the allowed claims of the Pension Funds would be paid in full, they seek, by way of Dismissal Motion to avoid any payment to the Pension Funds while dissipating the greatest part of their as-

sets." Further, it is urged that, "The Debtors' sincerity must ... be questioned since by the time the District Court action is completed, the Debtors' assets will certainly be fully dissipated or be few in number ... At the same time, the Schear brothers would be relieved of their personal guarantees to the secured creditors. Moreover, the objections filed by the Pension Funds to the claims of the secured creditors would be rendered moot and the secured creditors would emerge unscathed."

This argument is not to be taken lightly because the bankruptcy courts must certainly consider the best interest of all of the creditors subject to the court's jurisdiction as protected thereby. The court must consider whether dismissal apparently in the special interests of certain claimants which have not opposed such action at this late date (such as secured creditors, administrative creditors and tax creditors) because of favorable and satisfactory extrajudicial negotiations, would be prejudicial to any class herein affected by a liquidation of estate assets.

Such interests, nevertheless, can be adequately and expeditiously protected by provisional remedies available in the state and federal courts which already have jurisdiction over both the *res* and, even more importantly, over parties and legal issues involved, which are not subject to the limited case jurisdiction of the bankruptcy court.

The "reorganization" process does not and cannot because of the limited jurisdiction available contemplate any determination in the bankruptcy court as to the status of the corporate debtors as subsidiaries of entities not now subject to reorganization court jurisdiction yet vitally concerned with potential liabilities affecting the debtors and interested parties in the instant case.

Hence the waste of economic resources of the litigants as a factor must be applied to a consideration of the results to be anticipated (even at any cost). For this bankruptcy court to place a judicial imprimatur upon a liquidation of the estate assets as a mere ancillary proceeding which portends only a putative result and improper prejudice and compromise of basic conflicts properly justiciable only in courts with more inclusive jurisdiction certainly derogates from the best interests of some creditors. The futility of the purpose of the judicial process here involved is a crucial factor upon a consideration of the issue of dismissal of the case.

In summary, a new perspective has been added to litigation in the bankruptcy courts, perhaps reflected by the remarks of Senator Orrin Hatch of Utah in the Congressional Record—SENATE, May 21, 1984 at S.6089, concerning pending bankruptcy legislation (H.R.5174) as follows:

"Although efficiency is an important value, it simply should not be the only criterion used to set judicial policy. The purpose of our constitutional institutions has never been solely efficiency. Indeed, many of our institutions and policies are purposefully slow and deliberate to insure that the rights of all affected parties receive appropriate representation. Federalism and respect for State court processes are important values even if there is some slight cost in terms of efficiency."

This philosophy, nevertheless, can be applied and prevail as a political policy only in non-bankruptcy courts in a context other than the protection of creditors and the reorganization of debtors already confronting critical and desperate problems. Long, protracted litigation of vital issues outside the ambit of bankruptcy court jurisdiction only compounds these desperate conditions. Awaiting resolution of urgent and critical issues in multifarious courts is an anathema and fatal to the reorganization process. Furthermore, such compounding of litigation costs should not be suffered even by economically healthy and sound debtors. The legal issues among parties involved in this case which are not subject to bankruptcy court "Article I jurisdiction" must be resolved in the proper forums before any reorganization process can be implemented. The bankruptcy courts cannot feasibly

function as merely a sanctum sanctorum while the fundamental conflict resolution and conflict management impacting the reorganization process is subject to the jurisdiction of extraneous forums. Already the disposition of issues in this case not justiciable in the bankruptcy court have been forestalled for over two years, and no end is in sight.

If all of the necessary parties were subject to the bankruptcy core jurisdiction, conversion of the case to a Chapter 7 liquidation would maintain the legal status quo among the present litigants, but could accomplish no more than a sale and liquidation of the estate assets. Such can be accomplished by the litigants under the jurisdiction of the state and U.S. district court in litigation there pending, and without the added costs of the typical Chapter 7 administration.

Although this court has never shirked (and does not now) its responsibility to effectuate jurisdiction conferred, the purpose and posture of the cases *sub judice* mandate dismissal. The juristic manifold rests in extraneous courts.

Being mindful that a "transition period" is needed for the parties to protect their rights and to maintain the *status quo ante* in other courts by prosecuting provisional remedies it is ORDERED that jurisdiction is retained in the instant case under suspension for forty-five days and the dismissal of the case is made effective 45 days after the date of filing this decision and order.